STATE OF VERMONT

ENVIRONMENTAL COURT

|  |  |  |
|---|---|---|
| | } | |
| **Glebe Mountain Wind Energy, LLC** | } | **Docket No. 234-11-05 Vtec** |
| (Appeal of JO #2-227) | } | |
| | } | |

**<u>Decision on Cross-Motions for Summary Judgment</u>**

Glebe Mountain Wind Energy, LLC ("Appellant" or "GMWE") appealed from Jurisdictional Opinion (JO) #2-227 of the Acting District 2 Environmental Coordinator, issued on October 6, 2005, concluding that a "proposed wind energy project represent[s] material and substantial changes to existing Act 250 permits and thus require[s] an [Act 250 permit] amendment." Appellant is represented by Christopher D. Roy, Esq.; Interested Person Glebe Mountain Group, Inc. (GMGI) is represented by Robert E. Woolmington, Esq.; Interested Person Vermont Electric Power Co. (VELCO) is represented by Stephen A. Reynes, Esq.; Interested Person Central Vermont Public Service (CVPS) is represented by Carolyn Brown Anderson, Esq.; Interested Person Town of Windham and Intervenor Town of Windham Planning Commission are both represented by David Grayck, Esq.; Intervenor Department of Public Service (DPS) is represented by Aaron Adler, Esq.; Intervenor Natural Resources Board is represented by Melanie Kehne, Esq.; and Intervenor Windham Regional Planning Commission is represented by Richard D. Perra, Esq.

Now pending before this Court are cross-motions for summary judgment filed by Appellant, by Interested Person Glebe Mountain Group, Inc., and jointly by Interested Person Town of Windham and Intervenor Town of Windham Planning Commission. Intervenor Windham Regional Commission also filed a motion for summary judgment, advising that it joined in the motion filed on behalf of Glebe

1

Mountain Group, Inc. Memoranda in support of Appellant's motion for summary judgment have been filed on behalf of VELCO and DPS.

## Factual Background

The parties have stipulated to the material facts in this case, which are as follows:

1. Appellant is developing plans for a wind power generation facility on Glebe Mountain in the Towns of Londonderry and Windham (the "Project").

2. The Project includes the construction of up to twenty-seven wind turbines and associated roads and accessory structures.

3. The Project is proposed to be located on two parcels of land (the "Tract") owned by the McGraw Family Partnership and Magic Mountain, LLC. The Tract, or portions of it, is encumbered by a number of Act 250 permits and amendments previously issued to other projects on the same parcels. There are five sets of permits and amendments thereto, dating back to 1971. The various permits are referenced in JO #2-227, at ¶¶ 12–36.

4. Appellant has installed one temporary wind measurement tower on the Project site. This tower was approved by the Vermont Public Service Board (PSB) pursuant to 30 V.S.A. § 248(j) on January 29, 2004, in PSB Docket No. 6786. In that proceeding, on October 8, 2004, the PSB also approved the installation of two additional temporary wind measurement towers on the Project site. These two additional towers have not yet been installed.

5. The Project is an "electric generation facility" subject to review by the PSB pursuant to 30 V.S.A. § 248.

6. Appellant has not finalized the project's design, and has not yet filed a petition for a certificate of public good with the PSB pursuant to 30 V.S.A. § 248.

7. Appellant sent the Windham Regional Planning Commission and the Towns of Londonderry and Windham a formal notice of intent to file a petition for a certificate of public good with the PSB pursuant to 30 V.S.A. § 248.

2

8.    The Parties have agreed by stipulation, for the purposes of this appeal only, that if the analysis typically employed under Environmental Board Rule 34 were to apply to the Project as currently planned, it can be assumed that the Project would constitute a material and/or substantial change to the previously approved development on the Project site under one or more Act 250 criteria found in 10 V.S.A. § 6086.

## Discussion

At issue in this appeal is a jurisdictional conflict between Act 250 review under a concept known as "amendment jurisdiction," see former Environmental Board Rule 34[1] (EBR 34), and PSB jurisdiction over power generation facilities under 30 V.S.A. § 248. The conflict arises because a power generation facility is being proposed on lands that are already encumbered by multiple Act 250 permits, amendments thereto and the many conditions contained therein.[2]

It is undisputed that if the wind power generation facility were proposed on land unencumbered by Act 250 permit conditions, then jurisdiction over the proposed facility would rest solely with the PSB. Electric generation or transmission facilities that require a certificate of public good under 30 V.S.A. § 248 are defined out of the term

---

[1] The former Environmental Board Rules have been supplanted by the Act 250 Rules promulgated by the Natural Resources Board, effective May 1, 2006. We look to the former Environmental Board Rules as they existed on October 6, 2005, because we are required to apply the substantive standards that were applicable before the tribunal appealed from, pursuant to 10 V.S.A. § 8504(h). The Legislature ratified former EBR 34, along with all other Environmental Board rules pertaining to the administration of Act 250, by Public Act 52, § 5 (1985), and the Rule therefore "has the same effect as would any law passed by the Legislature in the first instance." In re Spencer, 152 Vt. 330, 336 (1989).

[2] See Vermont Commission on Wind Energy Regulatory Policy: Findings and Conclusions, Attach. A to Appellant's Mot. for Summ. J., at § 4.2.1(7):

> There are conflicting opinions and there is currently no definitive answer for how to deal with the potential for overlapping jurisdiction between Section 248 and Act 250 (e.g., on land that already falls under an existing Act 250 permit). For example, some wind turbines may be proposed on lands that are already subject to the jurisdiction of Act 250 with permit conditions that may be difficult to resolve without going through two regulatory processes. Section 248 should have jurisdiction in these cases but provide for consideration of the existing Act 250 permit conditions.

"development" by 10 V.S.A. § 6001(3)(D)(ii), and therefore do not trigger Act 250 jurisdiction.

The question before the Court is not whether the Project constitutes "development" under Act 250 (as it clearly does not), but whether the Project will cause material or substantial changes to previously permitted development, and thus require the holders of the pre-existing permits to seek a permit amendment under EBR 34. EBR 34(A), effective January 12, 2004, required a permit amendment "for any material or substantial change in a permitted project."

Appellant argues that, although EBR 34 would require a permit amendment "if the analysis typically employed . . . were to apply," Stipulation of Facts at 2, that requirement would be at odds with the Legislature's grant to the PSB of exclusive jurisdiction over § 248 projects. Appellant reasons that since power generation facilities do not constitute development in the context of Act 250, the construction of such facilities cannot trigger amendment jurisdiction under EBR 34 because "material or substantial change," as that term is used in EBR 34, is a subset of "development." See EBR 2(A)(1)(e) ("'Development' means . . . (e) Any construction of improvements which will be a substantial change of a pre-existing development, and any material or substantial change to an existing development over which the board or a district commission has jurisdiction"). Intervenor DPS offered its concurrence at the motion hearing by asserting that amendment jurisdiction is a derivative of development jurisdiction and not an independent source of jurisdiction.

The consequence of the argument expounded by Appellant and the DPS is that if the District Commission is deprived of development jurisdiction over power generation facilities, then the Commission is likewise deprived of amendment jurisdiction over those facilities.

Interested Person GMGI opposes Appellant's interpretation. GMGI agrees that Act 250 jurisdiction is not triggered by the construction of power generation facilities,

but argues that when the construction of those facilities creates a material or substantial change to an existing development encumbered by an Act 250 permit, then Act 250 review of the changes to the pre-existing development is required.

The plain language of EBR 34 and § 248 do not provide an answer. Neither statutory provision specifically addresses the situation at bar: that is, construction of a § 248 project on lands already encumbered by Act 250 permit conditions. In resolving this jurisdictional conflict, our task is to "discern and implement the intent of the Legislature." In re MacIntyre Fuels, Inc., 2003 VT 59, ¶ 7. District Commission jurisdiction over development and PSB jurisdiction over power generation facilities are both in derogation of common law property rights, and therefore both must be strictly construed. See Committee to Save Bishop's House, Inc., 137 Vt. 142, 152 (1979) ("The court's true function is to give effect to the legislative intent, and in this endeavor, we are guided by rules of general applicability, evolved through long judicial experience. One of these is that legislation in derogation of common law property rights will be strictly construed.").

We conclude that EBR 34 represents an explanation of and not an expansion from the statutory jurisdiction granted to District Commissions. The "amendment jurisdiction" set out in EBR 34 is the lawful interpretation of existing Act 250 jurisdiction, which does not extend to the "construction of improvements for an electric generation or transmission facility that requires a certificate of public good under section 30 V.S.A. § 248." 10 V.S.A. § 6001(3)(D)(ii).

Interested Person the Town of Windham and Intervenor the Town of Windham Planning Commission argue in their joint motion for summary judgment that "where land is subject to an Act 250 permit, a permit amendment is required under Board Rule 34 for otherwise exempt activity—such as logging[3] or farming—where such activity is a

---

[3] The site preparation and construction for the proposed facility would involve tree-cutting on the top of Glebe Mountain.

substantial or material change to the permit or permitted project," This argument by the Town and its Planning Commission relies upon the Environmental Board's analysis in Re: Keith Van Buskirk d/b/a/ American Wilderness Resources, Inc., Declaratory Ruling No. 302, Findings of Fact, Conclusions of Law, and Order (Aug. 15, 1995).[4] In Van Buskirk, the Environmental Board, noting that logging activities below the elevation of 2,500 feet are excluded from the definition of development, went on to state that the "[a]pplication of the logging exclusion to Van Buskirk's operations does not end the jurisdictional inquiry. The logging exclusion does not absolutely prohibit the assertion of Act 250 jurisdiction over the cutting of trees [below 2,500 feet] . . . . A competing consideration is the Board's (or district commission's) authority to impose conditions when granting Act 250 permits." Id. at 8. The Environmental Board found an exception to the logging exclusion, ruling that:

> Where findings of fact or conditions regarding tree cutting or logging are included in a permit, or a representation is made that no tree cutting or logging will take place, tree cutting or logging which constitutes a material or substantial change to that permitted development or subdivision will only be allowed if the permit holder applies for a[n amendment to their] permit under EBR 34.

Id. at 9.[5]

The situation in Van Buskirk is distinguished from the case before this Court by the fact that in Van Buskirk, the timber harvesting would come under Act 250 amendment jurisdiction, or under no jurisdiction whatsoever. The Board stated that "[t]he policy behind the exception to the logging exclusion is that logging and tree cutting associated with a development or subdivision has adverse effects with respect to

---

[4] In a recent decision, In re Green Crow Corp., 2006 VT 14, our Supreme Court stressed the "specialized expertise of the Environmental Board in determining whether it has jurisdiction over a particular development proposal." Id. at ¶ 7 (internal quotation omitted), citing In re Denio, 158 Vt. 230, 235 (1992).

[5] The Board did not order that Van Buskirk apply for a permit under EBR 34, but only because it found that no such findings, conditions, or representations were present in the case.

the ten criteria of 10 V.S.A. § 6086(a)." Id. An absolute exclusion for logging, then, could cause harm to the very values sought to be protected by Act 250. Here, however, it is not a question of "Act 250 jurisdiction or nothing." The excluded activity, construction of an electric generation facility, is subject to the jurisdiction of the PSB, which is required to conduct an environmental review, with due consideration to the applicable Act 250 criteria, pursuant to 30 V.S.A. § 248.

Section 248(a)(2) states that "(A) no company . . . and no person . . . may begin site preparation for or construction of an electric generation facility or electric transmission facility within the state which is designed for immediate or eventual operation at any voltage, . . . (B) . . . unless the public service board first finds that the same will promote the general good of the state and issues a certificate to that effect." 30 V.S.A. § 248(a)(2). When a petitioner files an application for a certificate of public good with the PSB, the PSB "shall hold a nontechnical public hearing" under 30 V.S.A. § 248(a)(4)(A), and one or more technical hearings under 30 V.S.A. § 248(a)(4)(B). The statute requires further that copies of the application:

> shall be given by the petitioner to the attorney general and the department of public service, and, with respect to facilities within the state, the department of health, agency of natural resources, historic preservation division, scenery preservation council, state planning office, agency of transportation, the agency of agriculture, food and markets and to the chairperson or director of the municipal and regional planning commissions and the municipal legislative body for each town and city in which the proposed facility will be located.

30 V.S.A. § 248(a)(4)(C).

Pursuant to 30 V.S.A. § 248(a)(4)(E), the Agency of Natural Resources:

> shall appear as a party in any proceedings held under this subsection, shall provide evidence and recommendations concerning any findings to be made under subdivision (b)(5) of this section, and may provide evidence and recommendations concerning any other matters to be determined by the board in such a proceeding.

7

Section 248(b)(5) provides the basis for Appellant's claim here that the PSB has exclusive jurisdiction over all electric power generation projects. Section 248(b) requires the PSB to make a number of findings before issuing a certificate of public good.

Prior to 1987, § 248(b)(5) required the PSB to find that the construction of an in-state electric power generation facility "will not have an undue adverse effect on aesthetics, historic sites, air and water purity, the natural environment and the public health and safety." In 1987, the Legislature amended § 248(b)(5)[6] by adding the phrase "with due consideration having been given to the criteria specified in 10 V.S.A. § 1424a(d)."[7] In 1988, the Legislature again amended § 248(b)(5)[8] by adding the phrase "and § 6086(a)(1) through (8) and (9)(K)."

As it exists now, and at the time of the appealed-from JO, § 248(b)(5) reads as follows:

> Before the public service board issues a certificate of public good as required under subsection (a) of this section, it shall find that the purchase, investment or construction: . . . with respect to an in-state facility, will not have an undue adverse effect on esthetics, historic sites, air and water purity, the natural environment and the public health and safety, with due consideration having been given to the criteria specified in 10 V.S.A. § 1424a(d) and § 6086(a)(1) through (8) and (9)(K)[.]

The phrase "due consideration" also appears in § 248(b)(1), requiring that due consideration be given to the recommendations of municipal and regional planning commissions, recommendations of municipal legislative bodies, and the land conservation measures contained in Town Plans.

---

[6] 1987, No. 67 (Adj. Sess.), An Act Relating to Establishing a Comprehensive State Rivers Policy (H. 339).

[7] Section 1424a(d) provides a non-exclusive list of fourteen criteria that may be considered by the water resources panel (at that time the water resources board) when deciding whether particular waters should be designated as outstanding resource waters.

[8] 1988, No. 273, An Act Relating to Act 250 Jurisdiction over Waste-Burning Electricity Generating Facilities (H. 681).

The "due consideration" language of § 248(b)(1) was interpreted by our Supreme Court to mean that those recommendations and land conservation measures were "advisory rather than controlling." City of South Burlington v. Vermont Electric Power Co., 133 Vt. 438, 447 (1975) ("'Due consideration' for municipal legislative bodies . . . at least impliedly postulates that municipal enactments, in the specific area, are advisory rather than controlling . . . . Any attempt at municipal regulation is pre-empted.").

The Legislature was presumably aware of the meaning ascribed to the phrase "due consideration" when it added that phrase to § 248(b)(5) in 1987 and 1988, see Heffernan v. Harbeson, 2004 VT 98, ¶9 ("When we interpret statutes, we presume that the Legislature was mindful of relevant precedents and prior legislation."). It is abundantly clear that the Legislature intended that the PSB have exclusive jurisdiction over electric generation facilities proposed on previously unencumbered land, as evidenced by the language excluding electric generation facilities from the definition of development, combined with the language empowering the PSB to grant certificates of public good "with due consideration" to Act 250 Criteria 1–8 and 9(K). It is less clear, however, that the Legislature intended that pre-existing Act 250 jurisdiction would disappear when an electric generation facility is proposed on land encumbered by Act 250 permit conditions.

Where the plain statutory language is not clear, the Court endeavors to give effect to the legislative intent underlying the statute by looking at "the legislative history and circumstances surrounding its enactment, and the legislative policy it was designed to implement." MacIntyre at ¶ 7 (internal quotation and citation omitted). The pertinent legislative history includes a meeting of the Senate Natural Resources and Energy Committee held on March 13, 1988, at which the Committee heard testimony relating to H. 681, which was enacted later that year as 1988, No. 273, An Act Relating to

Act 250 Jurisdiction over Waste-Burning Electricity Generating Facilities (H. 681).[9]  This Act added the phrase "and § 6086(a)(1) through (8) and (9)(K)" at the end of § 248(b)(5).

The hearing began with the testimony of Representative Emmons, who explained that questions regarding environmental review of waste-to-energy plants, wood-fired plants, and gas pipelines were raised during discussions on H. 681:

> Rep. Emmons:    When we started working on this, we were dealing with the Act 250 and the Environmental Board and also the Public Service Board . . . .  Environmental issues would be covered under the Environmental Board in their Act 250 review.  We had the chairman of the Environmental Board, Lon Wilson, and the Public Service Board, Rich Cowert, in our committee discussing this, and they worked out a compromise which seemed to be more workable, that under Public Service Board review—the 248 process—the environmental aspects of that would be expanded to include Act 250 criteria 1–9.

Appellant's Attach. D at 2–3.  Representative Emmons then outlined the structure of the House bill, and answered questions posed by Senator Racine, the Chairman of the Natural Resources and Energy Committee:

> Rep. Emmons:    [Subsection 5] on page 5 is where we include the Act 250 review.  10 V.S.A. Section 1424[a] and Section 6086, 1–8 and 9, that's your criteria 1–10 of Act 250 and that's where . . . . the compromise was between the Environmental Board and the Public Service Board—to include Act 250 review and 248 review. . . .
>
> Sen. Racine:    Would they need an Act 250 permit?
>
> Rep. Emmons:    No.  The certificate of public good is what they're going for and that's exactly the reason, Mr. Chairman, that we did incorporate the Act 250 process for our 248 review so it would not be duplicative.

---

[9] A transcript of the hearing was provided to the Court as Attach. D to Appellant's Mot. for Summ. J.

Sen. Racine: I don't understand what you're saying, you're incorporating the process. You aren't requiring a 250 permit, but you're requiring a 250 review? How will that work?

At this point there is a gap in the transcript with the notation "break to turn tape over." Some testimony, including Rep. Emmons' answer, appears to be missing. When the transcript resumes, PSB Chair Rich Cowert and Senator Carter have joined in the dialog:

. . .

Mr. Cowert: It[10] would apply to any Section 248 permit which would include electric transmission lines as well—electric generating station, electric transmission lines, gas line, anything that needed Section 248 review.

. . .

Sen. Carter: Can I go back and ask a question which ties in? I notice that you've got NEPA involved here as well. Why do we exclude Criterion 10 on laterals which deals with compliance with local and regional plans?

Mr. Cowert: I'll be glad to answer that. There's already a section in 248 which requires the [Public Service] Board to give due consideration to local and regional plans.

Sen. Carter: I realize you have to give due consideration to it, but you don't have to make a finding that it complies.

Mr. Cowert: Correct.

Sen. Carter: I guess I'm asking the question still why you phrased it that way.

Mr. Cowert: Why did we choose to go with due consideration rather than compliance with local plans?

Sen. Carter: Yes.

Mr. Cowert: The chief reason for doing that is that—first of all, the history of it in 248 was that the facilities that provide those utility services to the state are an integrated network, and it has always

---

[10] Presumably, the compromise by which the PSB would undertake the environmental review normally conducted by the Environmental Board.

been thought to be unwise to allow a single jurisdiction (inaudible) to put up a roadblock as part of a network.

Sen. Carter: I understand that. Is this a sign that the state, in fact, is pre-empting local and regional jurisdiction with respect to control of the location of these pipelines?

Mr. Cowert: That has always been the case.

Sen. Carter: Does this extend to secondary impacts?

Mr. Cowert: No.

Appellant's Attach. D at 4–8.

It is not absolutely clear what Senator Carter meant by "secondary impacts," but it is at least plausible that he was referring to situations like that discussed one year later by our Supreme Court in In re Southview Associates, 153 Vt. 171 (1989), where the Court upheld the Environmental Board's denial of a permit application to build a residential development in a deeryard, stating that the "proposed project would destroy ten acres of critical habitat and, through the secondary impacts of people living in the homes, imperil the remaining 34 acres." Id. at 178. It is also not clear whether Mr. Cowert was stating that PSB § 248(b) jurisdiction did not extend to secondary impacts prior to the proposed amendment, but would so extend if H. 681 were enacted, or whether he was stating that PSB jurisdiction would not extend even if H. 681 were enacted.

If it is true that the Legislature did not intend for the PSB's exclusive jurisdiction to extend to secondary impacts generated by § 248 projects, then they must have intended that jurisdiction over those secondary impacts would remain part of the Act 250 review process.[11]

_____

[11] There is some evidence that the Legislature intended that the PSB have exclusive jurisdiction over secondary impacts. Mr. Cowert testified that a "fact of life we have to deal with is that we don't have statewide or regional comprehensive land use planning to reassure us that we have the capability to manage the secondary effects of infrastructure as significant as the pipeline. So what can we do? Well, this bill attempts to do the best we can with what we've got right now." Appellant's Attach. D at 23. More to the point, the testimony of Mr. Parenteau, then the Commissioner of the Department of

Later in the hearing on H. 681, the testimony turns to the concept of "one-stop shopping" for permit approval.  Mr. Cowert continues his testimony as follows:

> Question: where should review lie?  And this goes back to the beginning of Act 250, and as you all know, the Legislature determined—and I think it was a good decision—that electric generating facilities and transmission facilities would not be subject to Act 250 review because the Public Service Board was going to review, and they did not want two-stop shopping. They wanted one-stop shopping. And everybody knew that the Public Service Board was going to have to review the financing of the facility, the way it's located and connected to the network, the system reliability issues that are related to the location of the network, whether transmission facilities are adequate to service a generating station, whether the company is going to have adequate catch [sic "cash"] flow and its effect on rates.  The Public Service Board is going to be reviewing all of those things, and it didn't make any sense to the Legislature to have the Environmental Board or the district environmental commission on a different track doing environmental review.  Consequently, there was language added to Section 248—very broad language—that required the Public Service Board to conduct an environmental review of those facilities at the same time that they were conducting these other reviews, the financial and system reviews.

Appellant's Attach. D at 16–17.

The "broad language" Mr. Cowert was referring to is the first portion of § 248(b)(5), which establishes the following standard of review: "with respect to an in-state facility, [the project] will not have an undue adverse effect on esthetics, historic sites, air and water purity, the natural environment and the public health and safety . . . ."  Mr. Cowert went on to state that the PSB viewed this language as giving it

---

Environmental Conservation, includes this statement: "The logic of [the shift in control to the PSB] is that you will have an expert board who will understand the full picture of the pipeline, the laterals, the mainline, secondary impacts, environmental concerns, growth concerns and all the rest.  But I do want to stress that I have not looked at this language or these criteria with a view towards could they be improved from the standpoint of secondary impacts.  It may well be that they could.  I don't know if the language needs to be changed, though."  Id. at 40. The legislative record presented to the Court in this appeal does not reveal an adoption or a rejection by House and Senate members of the witness testimony offered by Messrs. Cowert and Parenteau.

an environmental mandate "as broad and more flexible" than the mandate in Act 250, and that the PSB "looked at the criteria of Act 250 in order to be informed as to what the broad language of Section 248 meant." Appellant's Attach. D at 17. Mr. Cowert then noted that the phrase "due consideration having been given to the criteria specified in 10 V.S.A. § 1424a(d)" had been added in the previous year (1987), and stated that "we proposed [the language in the House bill] adding specifically the cross references to the appropriate sections of Act 250." Id. at 18.

It appears from the record presented to us that Mr. Cowert viewed the addition of the phrase "and § 6086(a)(1) through (8) and (9)(K)" as merely codifying the existing practice of the PSB, as he stated that "I view this as an improvement because it will codify what has been the unspoken practice in most cases that come before the PSB, which is that the PSB will look at Act 250 in order to determine whether the general umbrella language about the natural environment and the public health and safety has been met." Id. at 20.

Mr. Cowert then returned to the concept of one-stop as opposed to two-stop permit shopping:

> At one point I was discussing one-stop versus two-stop shopping and why I think that it is preferable to keep this review at the PSB rather than having an Environmental Board review and a PSB review. First, as I said, all on the system stability and economic factors, we're going to have that review in any event so you would have a dual track. You'd have the environmental review going off over here and the financial review going on over here. Now that raises an immediate coordination problem, not just in timing. It's a burden on everybody. It's a burden on citizens who want to oppose a facility. It's a burden on local select boards and planning commissions who have got to go to two sets of hearings. It's a burden on the applicant. It takes longer. I don't think it's worth it. But there's an even more fundamental problem. As you've seen with Vicon, over on the environmental side every time you change the litigation [sic "mitigation"] requirement, you change the economics of the project. You better install a new scrubber. You've got to change your ash disposal methods; you've got to do something over here. All of a sudden your

14

finances are different, and the terms of any contract that you've got for the sale of your power is going to be different. So the idea that you can somehow segregate these things in their two different worlds is just not reality. I think it's a lot more sensible to keep them in the same place.

Id. at 20–21.

Interested Person VELCO asserts that "[b]ecause [10 V.S.A.] § 6001(3)(D)(ii) excludes electric generation and transmission facilities that require a [certificate of public good], Act 250 jurisdiction does not apply to such facilities regardless of whether they would constitute a material or substantial change to existing development." VELCO Mem. in Support of Appellant's Mot. for Summ. J. at 11. We agree. Such facilities are carved out of Act 250 jurisdiction by the plain language of the statute. There are strong policy arguments, upon which the record establishes that the Legislature relied, supporting the sole jurisdiction of the PSB over such facilities, chief among them is the wisdom of having one statewide board handle the integrated electric generation and transmission network, so that no single local body can put up a roadblock. Also, the PSB has an institutional memory and an ever-growing body of knowledge regarding the cases it oversees, in contrast to local or regional boards which would have to reinvent the wheel with every case.

We wish to minimize any confusion or misinterpretation that our decision here may create, and therefore offer further comments on "secondary impacts," with the hope that these further comments do not increase the chance of confusion or misinterpretation. Even though the proposed facility itself is not subject to Act 250 jurisdiction, it is possible that the exempt facility will generate secondary impacts on the encumbered land surrounding the proposed facility. For example, the site clearing for any construction of the proposed facility may force sensitive or protected species off the site and onto surrounding encumbered land. The removal of forest cover and the creation of new impervious surfaces may alter stormwater runoff patterns in areas far

removed from a facility's footprint. In the above two examples, the site clearing and construction would be subject to the sole jurisdiction of the PSB, but the displacement of animals and altered stormwater runoff patterns could create impacts beyond the boundaries of the facility, and thus outside of the PSB's jurisdiction. These and other potential secondary impacts may either: (1) constitute material and substantial changes to the previously permitted projects, triggering EBR 34 amendment jurisdiction; or (2) create changes which must be addressed when an amendment to the pre-existing Act 250 permits is otherwise required, due to the ordinary evolution of the pre-existing developments on the lands of McGraw Family Partnership and Magic Mountain, LLC.

Such off-site, secondary impacts fall within the District Commission's particular area of expertise and jurisdiction, and not that of the PSB. The potential secondary impacts are local, depending on local conditions and the particulars of the existing permit conditions. The strong policy arguments in favor of exclusive PSB jurisdiction do not pertain to such impacts, as the District Commission would not be called upon to examine the proposed facility itself, nor would it be empowered to impose conditions on the facility, or prevent its construction. The proposed facility would simply be an act of the PSB, much as a meteor strike removing the top of Glebe Mountain would be an act of God. The District Commission can do nothing to prevent either one, but must address the changed conditions on the lands over which it has continuing jurisdiction and attempt to mitigate adverse impacts on the values sought to be protected by Act 250.

The existence of secondary impacts sufficient to require an Act 250 permit amendment is, at this point, merely theoretical. While the parties have stipulated that the proposed project would itself constitute a material or substantial change if the analysis typically employed under EBR 34 were to apply, they have made no such stipulation regarding secondary impacts. Appellant has yet to file a petition for a certificate of public good with the PSB for the proposed facility. Once that petition has

been submitted, the PSB may impose conditions or require alterations, so that the secondary impacts, if any, do not rise to the level of substantial or material changes requiring an amendment to the existing Act 250 permits. It will be the PSB that conducts the environmental review of the proposed facility, with due consideration to Act 250 Criteria 1–8 and 9(K) as required by § 248(b)(5). Furthermore, it is up to the PSB to determine the physical boundaries of the facility, within which its jurisdiction is exclusive, and beyond which the District Commission retains continuing jurisdiction on the subject properties.

If the PSB issues a certificate of public good for the proposed facility, and the facility subsequently generates secondary impacts beyond the boundary established by the PSB, and those impacts amount to a substantial or material change to the surrounding permitted development, then there are a number of procedural avenues by which the District Commission could exercise its authority to address the impacts. The secondary impacts could cause the previously permitted development to be in violation of prior permit conditions, resulting in an enforcement action that could be resolved though a permit amendment. Or, the holder of an Act 250 permit could seek a permit amendment for any reason, and the District Commission could then address the secondary impacts in conjunction with the requested amendment. We leave the consideration of these possible future scenarios to a future proceeding, as they are not a case or controversy before us here.

Accordingly, based on the foregoing, it is hereby **ORDERED** and **ADJUDGED** that Appellant's motion for summary judgment is **GRANTED** as to Question 1 in Appellant's Revised Statement of Questions. In so ruling, we conclude that Act 250 jurisdiction under ERB 34 does not attach to electric generation facilities that are located on lands encumbered by pre-existing Act 250 permits. For these same reasons,

17

Interested Person GMGI's motion for summary judgment is DENIED as to Question 1 in Appellant's Revised Statement of Questions.

As to Question 2 in Appellant's Revised Statement of Questions, Appellant's motion is GRANTED to the extent that it refers to the PSB's exclusive jurisdiction over all impacts within the boundaries of the subject facility. However, Appellant's motion is DENIED to the extent that it refers to secondary impacts beyond the established boundaries of the proposed § 248 facility. We deny that part of Appellant's motion for the reason that such impacts are not properly before this court and therefore do not constitute a case or controversy for which this court has authority to rule. See Cupola Golf Course, Inc. v. Dooley, 2006 VT 25, ¶ 11 (stating that "the judiciary is not empowered to render advisory opinions. Courts are not permitted to dispose of the merely hypothetical."). For these same reasons, the various summary judgment motions filed on behalf of Interested Persons GMGI and Town of Windham and Intervenors Town of Windham Planning Commission and Windham Regional Planning Commission are also **DENIED** as to Question 2.

Because we have adjudicated all of Question 1, and that part of Question 2 that presents an actual case or controversy to us, and because no other Questions are contained in Appellant's Statement of Questions, this decision concludes the proceedings before this Court in this appeal. A Judgment Order accompanies this decision.

Done at Berlin, Vermont this 18th day of May, 2006.

_____
Thomas S. Durkin, Environmental Judge