STATE OF VERMONT

| SUPERIOR COURT<br>Vermont Unit | ENVIRONMENTAL DIVISION<br>Docket No. 42-4-13 Vtec |
|---|---|
| Burlington Airport A250 JO 4-231 (F-35A Jets) | ENTRY ORDER |

### Decision on Cross-Motions for Summary Judgment and Motions to Strike

Richard Joseph, Juliet Beth Buck, Roger Bourassa, and James Marc Leas (Appellants) appeal a March 21, 2013 jurisdictional opinion (JO) of the District 4 Environmental Commission Coordinator (District Coordinator) which determined that Act 250 jurisdiction does not apply to the proposed siting of 18 or 24 F-35A jets (F-35As) and approximately $2.3 million of new construction to accommodate the F-35As at the Vermont Air National Guard (VTANG) base adjacent to the Burlington International Airport (Airport) in the City of Burlington, Vermont. The City of Burlington (the City) cross-appeals. Now pending before the Court are cross-motions for summary judgment by the City and Appellants, Appellants' motion to strike paragraphs 12, 14, and 22 of the City's Statement of Undisputed Material Facts, and the City's motion to strike portions of Appellants' surreply. Appellants are represented by James A. Dumont, Esq., and the City is represented by Brian S. Dunkiel, Esq. and Erik G. Nielsen, Esq. The Vermont Natural Resources Board (NRB), represented by Peter J. Gill, Esq., and the Greater Burlington Industrial Corporation and Friends of the Vermont Air Guard, Inc., both represented by Christopher D. Roy, Esq., entered appearances in this matter. The Greater Burlington Industrial Corporation and Friends of the Vermont Air Guard, Inc. filed a Memorandum of Law in Response to Cross-Motions for Summary Judgment.

### Factual Background

For the purpose of putting the pending motions into context, we recite verbatim the City's Statement of Undisputed Material Facts (SUMF) (filed Nov. 1, 2013, citations omitted), which the Court understands to be undisputed other than Appellants' objection to paragraphs 12, 14, and 22:

1.      [Burlington International Airport (BIA)] is owned and operated by the City of Burlington [(the City)]. BIA is an international airport developed with the use of federal funds.

2.      Aircraft operations at what is now known as the BIA date back to 1920.

3.      The history of Act 250 regulation of BIA dates to November 18, 1971, when the City received its first Act 250 land use permit to install and operate an airport hangar and support facilities.

4.      BIA holds a number of Act 250 permits and amendments, none of which regulate commercial or military aircraft operations, aircraft noise, or aircraft operations of the [Vermont Air National Guard (VTANG)].

5.      The District #4 Environmental Commission has specifically rejected the notion that it has the legal authority to regulate any aircraft noise.

6.      The VTANG maintains a base adjacent to BIA, which is home to the Air Guard's 158th Fighter Wing installation.

7.      The land upon which the VTANG's base is located is leased from the City of Burlington by the [United States Air Force (USAF)].

8.      The land upon which the VTANG's base is located is used by the VTANG under license from the USAF.

9.      The VTANG base occupies approximately 280 acres of land to the east of BIA, where VTANG maintains 44 buildings in support of their mission.

10.      The land upon which the VTANG base is located was leased by the City to the USAF for nearly thirty years prior to the time the airport was first subjected to Act 250 jurisdiction.

11.      From time to time, the City and the Federal Government have executed supplements to their leases, with the latest one dated March 26, 2012. Currently, the term of the Lease has been extended through June 30, 2048.

12.      . . . .

13.      Pursuant to directives of Congress and the Secretary of Defense, via fiscal legislation and the development of the "Joint Strike Fighter" program, the USAF, in conjunction with the Department of the Navy and the Marine Corps, is charged with preparing the military's next generation aircraft, the F-35A, for combat. The USAF's stated purpose for the beddown of the

2

F-35A is to "efficiently and effectively maintain combat capability and mission readiness as the Air Force faces deployment across a spectrum of conflicts while also providing for homeland defense."

14. The USAF controls the decision regarding where to beddown the F-35A for training and mission-readiness purposes, and also controls the scope of the construction and improvements needed wherever the aircraft are beddown.

15. The USAF is considering six potential sites for the beddown of the F-35A. One of these potential sites is at the VTANG Base.

16. The USAF issued its [Final Environmental Impact Statement (FEIS)] in September 2013 analyzing its proposed action – a decision regarding where to beddown the F-35A.

17. The final federal decision about whether to site the F-35A at VTANG will be made through a Record of Decision prepared by the Assistant Secretary of the USAF, or his/her designee. [This decision was issued on December 2, 2013, as discussed in paragraph 23 below.]

18. Under two alternative scenarios considered by the USAF, either 18 or 24 F-35A aircraft would be beddown at VTANG's base.

19. Under either scenario, the USAF would install five internal infrastructure improvements associated with the beddown of the F-35A.

20. These improvements would occur entirely within existing VTANG buildings on its base.

21. The infrastructure improvements include: (1) internal renovation to Building 120 for an F-35A Simulator; (2) Provide 270DC, 28DC Power in Aircraft Shelter Parking Areas; (3) Provide Secure/Classified Upgrades in Rooms 004/004A, Building 140; (4) Provide a Secure Parts Storage Area for ALIS, Building 70 Warehouse; and (5) Internal design improvements.

22. The F-35A will primarily be used by the VTANG for training missions. Should the F-35A be used in a combat mission or otherwise by the VTANG, the USAF cannot conceive of a state purpose that it could be used for.

**Additional Factual Background beyond the City's SUMF**

23. On December 2, 2013, the U.S. Air Force issued its "Record of Decision (ROD) for the F-35A Operational Basing Environmental Impact Statement (EIS) (Federal Register, Vol. 78, No. 193, EIS No. 20130295, pg. 61845, October 4, 2013)," stating that "the Air Force has decided to

3

base eighteen (18) F-35A aircraft with associated construction at Burlington AGS in Vermont to accommodate aircraft anticipated to start arriving in 2020."[1] (Appellants' Surreply to City's Mot. for Summ. J., Attach. 14, filed Jan. 10, 2013; Interested Persons' Mem. of Law in Resp. to Cross-Mots. for Summ. J., Ex. A, filed Dec. 23, 2013).

24.    Airport runway 15-33 (the runway) is shared with the VTANG and the USAF, and a number of Act 250 permits relate to the runway.

### Appellants' Statement of Undisputed Facts

Appellants also submitted a Statement of Undisputed Facts.  The facts presented by Appellants do not alter or add to the Court's adoption of the City's SUMF above or are immaterial to the legal determinations presented to the Court in the cross-motions for summary judgment.  Appellants' paragraph 5 does state that Airport runway 15-33 (the Airport runway) is shared with the VTANG and the USAF and that a number of Act 250 permits relate to the runway.  The City does not dispute this fact, and we have therefore incorporated this fact in paragraph 24 above.

### Motion to Strike Paragraphs 12, 14, and 22 of City's SUMF

In their opposition to the City's motion for summary judgment, Appellants object to paragraphs 12, 14, and 22 of the City's SUMF, and ask the Court to strike these three paragraphs, which state the following:

> 12.    Fighter aircraft operations at the VTANG Base have been conducted for purely federal purposes since the base was initially leased to the USAF back in the 1940s. *See Letter from Randon H. Draper, Colonel, USAF, to Attorney James A. Dumont*,  responding to appellants' discovery requests (USAF Discovery Response), at 4 (July 31, 2013) (attached and labeled Exh. E)

> 14.    The USAF controls the decision regarding where to beddown the F-35A for training and mission-readiness purposes, and also controls the scope of the construction and improvements needed wherever the aircraft are beddown. *See* USAF Discovery Response at 3–4 (*Exh. E.*); FEIS §§ 1.0, 1.2.1, 1.5, 4.0 (*Exh. B*).

> 22.    The F-35A will primarily be used by the VTANG for training missions. Should the F-35A be used in a combat mission or otherwise by the VTANG, the USAF cannot conceive of a state purpose that it could be used for.  FEIS § 1.3 (*Exh. B*); USAF Discovery Response at 4 (*Exh. E*).

---

[1] Thus, we disregard the City's SUMF paragraphs 17 and 18, with the understanding that the USAF has decided to beddown 18 F-35As at the VTANG base.

Following Appellants' service of interrogatories and requests to produce on the City and a subpoena duces tecum and subpoena for deposition testimony on the VT Air National Guard, Colonel Randon H. Draper of the U.S. Air Force sent a letter to Appellants regarding these requests. Appellants argue that Colonel Draper's letter, cited in each of these three questions, is hearsay from a non-party, which has not been submitted to the Court under oath, contrary to V.R.C.P. 56(e). Appellants assert that the letter contains inadmissible conclusory statements of opinion without foundation. Because paragraphs 12, 14, and 22 of the City's SUMF rely on these statements, Appellants argue that they should be stricken. Appellants state that if this Court intends to rely on the letter, they further move pursuant to V.R.C.P. 37(a)(2) for an order compelling the VT Air National Guard to produce the witnesses identified in Appellants' earlier subpoenas to answer, under oath, the questions set forth in the subpoena and to produce the requested documents.

In the summary judgment analysis that follows, we do not consider Colonel Draper's letter, and do not rely on paragraph 12. To the extent we rely on the statements of facts contained in paragraphs 14 and 22, we find adequate support for those statements elsewhere in the record, specifically in the FEIS, to which Appellants do not object and portions of which Appellants themselves attached to their filings. Thus, we need not consider the admissibility of Colonel Draper's letter, and we therefore **STRIKE** the City's SUMF paragraph 12 and **DENY** Appellants' motion to strike paragraphs 14 and 22.

### Summary Judgment Standard

The Court will grant summary judgment if a moving party demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." V.R.C.P. 56(a); V.R.E.C.P. 5(a)(2). When considering cross-motions for summary judgment, the court looks at each motion individually and gives the opposing party the benefit of all reasonable doubts and inferences. City of Burlington v. Fairpoint Commc'ns, Inc., 2009 VT 59, ¶ 5, 186 Vt. 332. The court also accepts as true all factual allegations made in opposition to a motion for summary judgment so long as they are supported by "specific citations to particular parts of materials in the record . . . ." V.R.C.P. 56(c)(1)(A).

5

**Act 250 Jurisdiction**

The Legislature enacted Act 250, 10 V.S.A. §§ 6001 through 6093, over forty years ago "to protect Vermont's lands and environment by requiring statewide review of 'large-scale changes in land utilization.'" In re Audet, 2004 VT 30, ¶ 13, 176 Vt. 617 (mem.) (quoting Comm. to Save Bishop's House, Inc. v. Med. Ctr. Hosp. of Vt., Inc., 137 Vt. 142, 151 (1979)). A "person" proposing land "development" must obtain an Act 250 permit. 10 V.S.A. § 6081(a). A municipality or State agency is a "person" under Act 250; a federal agency is not. 10 V.S.A. § 6001(14)(A). "Development" is defined as one or more of 10 listed activities, including "[t]he construction of improvements on a tract of land involving more than 10 acres that is to be used for municipal, county, or state purposes." 10 V.S.A. § 6001(3)(A)(v). Act 250 Rule (2)(C)(3) defines "construction of improvements" as "any physical action on a project site which initiates development," subject to certain enumerated exceptions. Natural Resources Board Act 250 Rules, Rule 2(C)(3), Code of Vt. Rules 16-5-200:2(C)(3) (WL) (2009).[2] "State, county or municipal purposes" means the construction of improvements which are undertaken by or for the state, county or municipality and which are to be used by the state, county, municipality, or members of the general public." Id. at 16-5-200:2(C)(15).

**Whether the F-35A Siting and Associated Improvements Constitute "Development"**

Appellants argue that the VTANG is a state agency serving state purposes. They further argue that because the F-35As will be sited and maintained at the VTANG base, the construction of improvements and siting of the F-35As will be undertaken for the state and used by the state, constituting development subject to Act 250 jurisdiction.

In the early 1980s, the former Environmental Board considered the construction of improvements associated with the replacement of EB-57 aircraft with F-4 aircraft at the VTANG base to carry out the "national defense mission of the Air Guard." The Environmental Board concluded that the purpose of the construction was a "federal purpose" because the improvements would be constructed, funded, and owned by the federal government, and the improvements would be located on more than ten acres of land controlled by the federal

---

[2] Rule 2(C)(3) was amended effective October 1, 2013. Code of Vt. Rules 16-5-200:2(C)(3) (WL) (2013). Because the JO was requested in December 2012 by Appellants and January 2013 by the City, the 2009 language applies here.

government.  Re: Vt. Air Nat'l Guard, Findings of Fact, Conclusions of Law and Order, No. 134, at 3 (Vt. Envtl. Bd. July 20, 1982).  In its conclusions of law, the Environmental Board acknowledged that "the Air Guard is a state organization that both 'serves the state in time of civil emergencies within the state' and is 'available for federal service during national emergencies.'"  Id. (quoting Mela v. Callaway, 378 F. Supp. 25, 28 (S.D.N.Y. 1974)).  The Board then addressed an argument similar to that made by Appellants here, essentially that because the construction of improvements would serve a state purpose at least in part, the construction meets the definition of development in 10 V.S.A. § 6001(3).  The Environmental Board concluded, however, that because the proposed construction had an independent federal purpose (national defense) and was controlled by the federal government, it was "not for state purposes within the meaning of 10 V.S.A. § 6001(3)."  Id. at 4.  We are directed to give prior decisions of the Environmental Board the same weight and consideration as prior decisions of the Environmental Division.  10 V.S.A. § 8504(m).

The parties do not dispute that the stated purpose for both the siting of the F-35As and the internal building improvements is to "efficiently and effectively maintain combat capability and mission readiness as the Air Force faces deployment across a spectrum of conflicts while also providing for homeland defense." See City's Ex. B at 1-6.  This is a federal purpose, independent of any ancillary state purpose.  Any state purpose served by the building improvements and F-35A siting, if one exists, does not supersede this federal purpose.  It is also undisputed that the internal improvements and siting of F-35As will be constructed, funded, and owned by the federal government and that they will all be located on land controlled by the federal government.  Viewing the undisputed facts in the light most favorable to Appellants, we conclude that the proposed improvements and F-35A siting are proposed by a federal agency for a federal purpose, and not for state purposes within the meaning of 10 V.S.A. § 6001(3).  Thus, the building improvements and F-35A siting are not "development" under Act 250, and the City is entitled to judgment as a matter of law that the proposed activities at the VTANG base do not require an Act 250 permit.

**Material Change to a Permitted Development**

Act 250 Rule 34(A) requires a permit amendment for "any material change to a permitted development." Natural Resources Board Act 250 Rules, Rule 34(A), Code of Vt. Rules 16-5-200:34(A) (WL) (2009). A "material change" is "any change to a permitted development or subdivision which has a significant impact on any finding, conclusion, term or condition of the project's permit <u>or</u> which may result in a significant adverse impact with respect to any of the [10 Act 250 criteria]."[3] Natural Resources Board Act 250 Rules, Rule 2(C)(6), Code of Vt. Rules 16-5-200:2(C)(6) (WL) (2009) (emphasis added). The Environmental Board adopted a two-step analysis for determining whether there has been a material change. First, there must be a change to the proposed development, which includes either a physical change or a change in use. Second, the change must either have a significant impact on any finding, conclusion, term, or condition of the project's permit <u>or</u> have the potential to result in a significant adverse impact with respect to any of the 10 Act 250 criteria.[4] <u>Re: Hiddenwood Subdivision</u>, No. 378, Findings of Fact, Conclusions of Law, and Order, at 10 (Vt. Envtl. Bd. Jan. 12, 2000) (citations omitted).

Although we do not have the Act 250 permits before us, it is undisputed that the Airport runway 15-33 (Airport runway) is subject to Act 250 permits and that the F-35As will use the Airport runway. Thus, although we find that the siting of the F-35As and construction of internal improvements do not qualify as "development" and therefore do not, standing alone, require an Act 250 permit, we consider whether the F-35As' use of the Airport runway is a material change that requires a permit amendment.

In the first step of the material change analysis, the Court must determine whether the F-35A use of the Airport runway constitutes a physical change to or a change in use of a permitted development. <u>Id</u>. at 10–11. In considering whether a change is proposed, we must

---

[3] Prior to the amendment of the material change definition effective July 10, 2009, a material change was "any change to a permitted development or subdivision which has a significant impact on any finding, conclusion, term or condition of the project's permit <u>and</u> which may result in an impact with respect to any of the criteria specified in 10 V.S.A. Section 6086(a)(1) through (a)(10)." Code of Vt. Rules 16-5-200:2(C)(6) (WL) (2007) (emphasis added). Because the JO was requested in December 2012 by Appellants and January 2013 by the City, the 2009 language applies here.

[4] Although we adopt the Environmental Board's two-step analysis, we note that the specific requirements of step two are modified by the amended material change definition.

consider "the scope of the [development] initially reviewed and approved by the [District Commission]" and whether the proposed activities "were contemplated as part of the approved project in the first instance by the [District Commission]." Re: Vermont Institute of Natural Science, No. 352, Findings of Fact, Conclusions of Law, and Order, at 26 (Vt. Envtl. Bd. Feb 11, 1999); see Re: Developer's Diversified Realty Corp., Nos. 364, 371, and 375, Findings of Fact, Conclusions of Law, and Order, at 18 (Vt. Envtl. Bd. Mar. 25, 1999) (finding that retail use of Berlin Mall space was contemplated in permit issuance, and absent any conditions regarding the type of retailer, the lease of space to Wal*Mart rather than continuing the lease to Rich's Department Store was not a change in use).

The City proposes no physical change to the runway itself, and Appellants assert none. We therefore find that no physical change is proposed for the permitted development.[5] Appellants assert that the F-35A is a different type of aircraft and that it emits more noise than any aircraft types that have used the runway to date. In considering the proposed use of this runway, however, we conclude that the USAF's change from one type of aircraft to another is not a change in the use of the runway absent evidence that a new type of aircraft using the runway is beyond the scope of the development considered in the review and approval of the City's Act 250 permits for the runway. No such evidence has been presented to the Court. To the contrary, it is undisputed that for nearly thirty years prior to Act 250 jurisdiction first attaching to the Airport, the USAF leased land at the Airport from the City. The land leased by the USAF is nearby the runway, and the USAF shares the runway with other aircraft. It is also undisputed that the City's Act 250 permits do not regulate aircraft operations. The F-35A is simply another type of aircraft using the shared runway, and there is no evidence that prior Act 250 permit findings or conditions prohibit a change in aircraft type. We therefore conclude that the F-35A use of the runway is not a change in use. Because we find no physical change or change in use, we need not consider the second step of the material change analysis. We find

---

[5] Because we find no physical change to the Airport runway, we conclude that there will be no substantial change to a pre-existing development as defined by Act 250 Rules 34(B), 2(C)(7), and 2(C)(8). See Sec'y, Vermont Agency of Natural Res. v. Earth Constr., Inc., 165 Vt. 160, 164 (1996) (noting that the two-pronged test for a substantial change in a pre-existing development requires that there be a "cognizable physical change").

no material change to a permitted development; therefore, an Act 250 permit amendment is not required.

For the reasons stated above, we conclude that the siting of the F-35A and related improvements as presented here are not subject to Act 250 jurisdiction. We also conclude that the F-35A use of the Airport runway does not require a permit amendment. The City's motion for summary judgment is therefore **GRANTED**, and Appellants' cross-motion for summary judgment is **DENIED.**

### City's Motion to Strike Portions of Appellants' Sur-Reply

Because we grant summary judgment in the City's favor, the City's motion to strike is **MOOT.**

### Conclusion

For the reasons stated in detail above, the Court concludes that the proposed alterations to the VTANG base and the proposed siting of the F-35A jets at that base do not constitute development and therefore do not require an Act 250 permit. Furthermore, no physical change or change in use is proposed for the Airport runway, and amendment of the Act 250 permits for the runway is therefore not required. Finally, we find no substantial change to a pre-existing development. We therefore **GRANT** the City's Motion for Summary Judgment and **DENY** Appellants' Cross-motion for Summary Judgment. In considering the motions, we did not rely on Colonel Randon H. Draper's letter, and we **GRANT** Appellants' motion to Strike the City's SUMF paragraph 12 which was based entirely on that letter. In all other respects we **DENY** Appellants' motion to strike. We also **DENY as MOOT** the City's motion to strike portions of Appellants' surreply.

This completes the current proceedings before this Court. A judgment order accompanies this decision.

Electronically signed on May 13, 2014 at 10:48 AM pursuant to V.R.E.F. 7(d).

_____
Thomas G. Walsh, Judge
Superior Court, Environmental Division

10